UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

SHERRY E. PERKINS,                          )
                                            )
                    Plaintiff,              )
                                            )
                                            )
        vs.                                 )        No. 2:09CV00038 AGF
                                            )
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security             )
Administration,                             )
                                            )
                    Defendant.              )


## MEMORANDUM AND ORDER

        This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Sherry E. Perkins was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434.  For the reasons set forth below, the decision of the

Commissioner shall be affirmed.

        Plaintiff, who was born on March 3, 1959, filed an application for disability

benefits on January 23, 2006, at the age of 46, alleging a disability onset date of

December 12, 2005, due to fibromyalgia, hypertension, gastroesophageal reflux disease

("GERD"), chronic obstructive pulmonary disease ("COPD"), depression, and panic

attacks.  After Plaintiff's application was denied at the initial administrative level, she

requested a hearing before an Administrative Law Judge ("ALJ") and such hearing was

held on December 10, 2007.  Plaintiff and a vocational expert ("VE") testified at the hearing.  By decision dated February 26, 2008, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a human resources director or other sedentary jobs, and, thus, was not disabled.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 29, 2009.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record.  Specifically, Plaintiff argues that the ALJ failed to accord adequate weight to the opinion of Plaintiff's treating internist (Erik Meidl, M.D.), failed to properly evaluate the severity of Plaintiff's fibromyalgia, improperly discredited Plaintiff's subjective complaints and the statements of third parties, and improperly relied on the VE's testimony that was based upon an allegedly flawed RFC assessment by the ALJ.  Plaintiff also asserts that the ALJ holds a "known and proven general bias" against Social Security disability claimants who, like Plaintiff, are female, obese, and allege mental impairments and/or fibromyalgia.

## BACKGROUND

### Work History and Application Forms

On her Work History form submitted in connection with her application for benefits, Plaintiff represented that she had worked as a full-time lace cutter from 1981 to 1994.  In 1995, Plaintiff was self-employed as a hairdresser and also worked on a factory

assembly line.  The record indicates that in 1995, Plaintiff was in a car accident requiring cervical spine fusion surgery and was awarded Social Security disability insurance benefits from about March 1995 to sometime in 2000, upon her completion of a nine-month trial work period.  From May 1999 to December 2005, Plaintiff worked as a human services director for a nonprofit organization.  At this last job, she prepared reports and shopped for and set up events.  She indicted that this work required her to walk and stand for one hour each and sit for six hours in an eight-hour workday.  But later on the form, she wrote that "[a]ll day" she had to do things like get files from other places, make copies, and put the files back.  (Tr. 160-61.)

On her Function Report, Plaintiff wrote that her primary daily activities consisted of helping her young son get dressed, taking him to day care, and preparing dinner for him and her husband.  She also washed dishes, folded and sorted clothes, and shopped for groceries.  Plaintiff's adult daughter provided transportation and assisted with household chores and childcare on days when Plaintiff was not feeling well.  Plaintiff further wrote that she had difficulty concentrating for longer than 20 minutes, often could not finish what she started, and had to review written instructions several times.  (Tr. 167-72.)

**Third-Party Statements**

Plaintiff's mother submitted a Third-Party Function Report dated February 17, 2006.  She reported that Plaintiff could handle light household chores but, due to pain, could not do heavy chores.  Plaintiff's mother stated that she and Plaintiff's husband helped Plaintiff care for her son.  Plaintiff's mother indicated that Plaintiff followed

written and oral instructions "very well" and did not have problems with authority figures. (Tr. 183-91.)

Plaintiff's adult daughter and Plaintiff's friend of 35 years also submitted third-party statements. These were dated November 25, 2007, and both essentially represented that Plaintiff would be unable to work because of chronic pain, episodes of depression, and anxiety, especially in social settings. Each declarant stated that she had observed Plaintiff experiencing neck, back, and hand pain; and having difficulty walking, standing, or sitting for more than about 15 minutes at a time, and doing her own hair. They thought that Plaintiff would have difficulty standing for a total of more than one hour and sitting for a total of more than three hours in an eight-hour day. (Tr. 214-16; 217-19.)

**Medical Record**

On February 1, 2005, Plaintiff was seen by her internist, Erik Meidl, M.D., for increasing problems with depression. Plaintiff reported feeling overwhelmed, frequently tired, and stressed by the demands of her job and family. She complained of throbbing headaches, occurring once or twice a month and lasting two to three days, and muscle and joint stiffness, particularly in the mornings. She had been taking Wellbutrin for depression for about six months, but stopped because she felt she was doing better. Dr. Meidl prescribed Zoloft 50 mg daily for depression and Ibuprofen 400-600 mg daily for muscle and joint pain. (Tr. 266-67.)

Plaintiff saw Dr. Meidl for follow-up visits in February and March 2005, during which time her Zoloft was increased to 100 mg and she was prescribed Flexeril and

Arthrotec for muscle tenderness and trapezious pain.  As of March 18, 2005, Plaintiff's fatigue and trapezious pain were much better and her depression was under "excellent control."  Dr. Meidl noted that a diagnostic test showed mild duodenitis for which he prescribed Prilosec.  (Tr. 269-75).

Plaintiff next saw Dr. Meidl on June 8, 2005, when it was noted that her energy level was good and that she was not feeling depressed.  She was also doing well with regard to her neck and shoulder discomfort, and was advised to continue on her current regimen.  (Tr. 276-77).  On December 1, 2005, however, Plaintiff reported right-sided facial pain, increased stress at work, frequent headaches, and neck and shoulder pain.  She expressed difficulty in maintaining her full-time job and taking care of her three-year old child as well.  Frequent typing had exacerbated the carpal tunnel syndrome with which she had previously been diagnosed.  Her depression was still well controlled.  Dr. Meidl gave Plaintiff nocturnal wrist splints for the carpal tunnel syndrome, continued her Ibuprofen, Flexiril, and Zoloft, and increased her Prilosec.  (Tr. 283-84).

On January 19, 2006, Plaintiff reported constant pain going from her cervical spine into her shoulders and down to her fingers; numbness and tingling in her fingers; and weakness in her hands, causing her frequently to drop things.  Plaintiff noted that her headaches had improved and she denied depressive symptoms.  Dr. Meidl documented decreased sensation to light touch in Plaintiff's arms and fingers, and prescribed Neurontin for pain.  (Tr. 286-88.)   An MRI of the cervical spine taken on January 23, 2006, showed reversal of the curvature of the spine and mild degenerative disk disease at

C5-C6, but no acute abnormalities.  (Tr. 289-90.)

On February 1, 2006, Plaintiff saw rheumatologist Carol Yvonne Crooks, M.D., upon referral by Dr. Meidl.  Plaintiff located her primary pain in her arms, shoulders, neck, and between her shoulder blades.  She also described bilateral hand numbness, intermittent cramping sensations in her fingers, and a weak grip causing her to drop things.  Walking and physical activities aggravated her pain.  Plaintiff reported that she had been using the wrist splints for the past month, but had stopped taking Zoloft because she thought it made her forgetful.  She told Dr. Crooks that she resigned from her job on January 3, 2006, due to increased stress and low energy, that she returned to school, majoring in education, and that she owned a thrift shop and "helped out" there.

On examination, Dr. Crooks noted decreased range of motion with neck flexion, but functional and symmetric neck extension, rotation, lateral bending, and arm range of motion.  A scan for tender fibromyalgia points was negative.  A sensory examination to light touch revealed generalized impairment in the left upper and lower extremities, but the impairment was "inconsistent with any neurologic level or pattern."  Dr. Crooks believed that Plaintiff's shoulder pain was most consistent with myofascial dysfunction. She prescribed Remeron as a replacement for Zoloft and recommended massage therapy, physical therapy, and a home exercise program for myofascial relief.  (Tr. 295-98.)

On February 10, 2006, a nerve conduction report indicated carpal tunnel syndrome.  (Tr. 301-03.)  On February 23, 2006, Dr. Meidl noted that Plaintiff was doing well with her carpal tunnel syndrome, that her GERD was under good control with

Prilosec, and that her depression was under excellent control with Remeron. (Tr. 291-92.) In February and March 2006, Plaintiff underwent a series of physical therapy sessions, progress notes from which indicated that the therapy went well, resulting in decreased pain and increased hand strength. (Tr. 306-13.)

On March 21, 2006, non-examining state agency consulting psychiatrist Glen D. Frisch, M.D., completed a psychiatric review of Plaintiff. He found that Plaintiff's depression was well-controlled with medication and caused no significant functional limitations. Dr. Frisch indicated, in check-box format, that Plaintiff had mild difficulties in maintaining concentration, persistence, or pace; no restriction in activities of daily living or in maintaining social functioning; and no episodes of decompensation. (Tr. 370-83.)

On March 24, 2006, state disability examiner S.A. Falter completed a physical RFC assessment of Plaintiff. Falter opined that Plaintiff's neck and shoulder pain, and her numbness, tingling, and weakness while gripping objects, limited her to work at the light exertional level; that she had a limited ability to reach overhead, handle, and finger objects; that she should never climb ladders, ropes, or scaffolds; and that she should avoid even moderate exposure to vibration and hazards like machinery or heights. (Tr. 384-91.) On May 18, 2006, Plaintiff complained to Dr. Meidl of increased pain along her lumbar spine and between her shoulder blades. She suspected that fibromyalgia was causing her back pain and requested referral to a rheumatologist. Plaintiff's Neurontin was increased and she was referred to Imelda P. Cabalar, M.D., for a

fibromyalgia evaluation.  (Tr. 340-41.)

Dr. Cabalar examined Plaintiff on May 31, 2006, and reported decreased range of motion in the hips, crepitations in both knees, and tenderness in the thoracic and lumbosacral spine with paravertebral muscle spasms.  All other joints showed no tenderness or decreased range of motion.  Dr. Cabalar assessed degenerative disk disease. (Tr. 342-44.)  X-rays conducted that day showed slight loss of several vertebral body heights in the mid thoracic region and mild bilateral L5-S1 facet arthopathy, but were otherwise unremarkable.  An abdominal exam was also unremarkable.  (Tr. 334-37.) When Plaintiff saw Dr. Cabalar for follow-up on June 6, 2006, Dr. Cabalar assessed chronic low back pain and degenerative joint disease, and recommended physical therapy, hot packs, TENS,[1] and stretching exercises.  (Tr. 344-45.)

On August 3, 2006, Plaintiff told Dr. Cabalar that for the past three weeks she had experienced pain and swelling in her right knee that was aggravated by walking.  Dr. Cabalar suggested Ibuprofen, three times a day as needed.  (Tr. 346.)  An x-ray of Plaintiff's right knee conducted on that day revealed no significant abnormalities.  (Tr. 333.)  At a follow-up visit on August 10, 2006, Plaintiff reported that her right knee was feeling a lot better and that the swelling had decreased considerably.  Dr. Cabalar assessed degenerative joint disease and chronic back pain, administered a steroid

_____

[1]    TENS (Transcutaneous Electrical Nerve Stimulation) is a treatment for pain in which pads are placed near the area of pain and electrical pulses are sent via the pads through the skin along the nerve fibers.  The pulses suppress pain signals to the brain.

injection to Plaintiff's right knee, advised Plaintiff on knee and back exercises, and told her to follow-up in three months. (Tr. 348.)

On August 17, 2006, Plaintiff saw Dr. Meidl again and reported that her depression was under good control and that she had stopped taking Prilosec because her stomach was doing well. (Tr. 349.) On September 22, 2006, Plaintiff told Dr. Meidl that she had stopped taking Zoloft two weeks prior to the visit because it was making her "too relaxed," but that she now felt anxious without it.[2] Dr. Meidl prescribed 50 mg Zoloft once daily. (Tr. 350.) On October 8, 2006, Plaintiff saw Dr. Meidl with complaints of pain in her right shoulder and trapezius, pain which developed while she was washing the walls in her home. Plaintiff reported a slight improvement in her depression since restarting Zoloft, and that she had stopped taking Remeron and Neurontin. Dr. Meidl administered an injection to Plaintiff's right shoulder, instructed her on shoulder exercises, and recommended that she restart Remeron and Neurontin. On October 25, 2006, Plaintiff reported that her right shoulder felt much better following the injection, and that her depression was much improved. (Tr. 352-55.)

When Plaintiff was seen by Dr. Meidl on November 20, 2006, she complained of high blood pressure, and shortness of breath with exertion. She admitted to smoking about a pack and a half of cigarettes per day. Neurontin was helping her pain, and her depression was doing well. Dr. Meidl prescribed hydrochlorothiazide for hypertension

---

[2] It is not clear from the record when Plaintiff restarted Zoloft after she told Dr. Crooks on February 1, 2006, that she had stopped taking it.

and a medicated inhaler for shortness of breath and recommended that Plaintiff quit smoking. A chest x-ray and EKG performed that day revealed no abnormalities. (Tr. 331, 359-61.)

On January 18, 2007, Plaintiff visited Dr. Meidl with complaints of increased depression and panic attacks. She reported that she slept frequently during the day but had trouble sleeping at night. Her smoking had increased to two and half packs per day, but the inhaler helped her breathing. Dr. Meidl prescribed Alprazolam and Xanax for panic attacks, increased Zoloft to 100 mg, noted that Plaintiff's blood pressure was still high, and again encouraged her to quit smoking. (Tr. 362-63.)

On February 15, 2007, Plaintiff told Dr. Meidl that her sleep, anxiety, and depression had improved. She had slight problems with balance while walking, but only for a few seconds. Dr. Meidl prescribed Lisinopril for hypertension and increased Zoloft to 150 mg daily. He suspected that the difficulties walking were related to Xanax and planned to wean Plaintiff off it in the next few months if her condition improved. (Tr. 365-66.)

On June 7, 2007, Plaintiff complained that her depression had worsened since she had stopped taking Zoloft at the beginning of May because it made her sleepy and she could not afford it. She was taking Xanax on an as needed basis, but was experiencing frequent panic attacks. She also stated that her back pain was getting worse, and that she recently had missed some blood pressure medication. On examination, Dr. Meidl noted that Plaintiff had some fibromyalgia trigger points, and he believed that "with her

underlaying psychiatric abnormalities currently she is at risk for flare-ups of her fibromyalgia."  He wrote that currently Plaintiff was unable to work due to her psychiatric problems and fibromyalgia and chronic pain from her prior neck injury, but that she might be able to work part-time in the future.  (Tr. 250-51.)

Dr. Meidl wrote on June 12, 2007, that Plaintiff told him that the Lexapro made her feel tired, sweaty, and "kind of foggy."  He advised her that the side effects may be temporary and to continue taking Lexapro.  (Tr. 251.)  On June 26, 2007, Plaintiff reported that she finished her last class (of the semester) the previous week, that Xanax had improved her stress level "significantly," that she was tolerating Lexapro better after starting to take it at night, and that she was taking Vicodin about once a day for her back and neck pain.  (Tr. 252-53.)

On August 16, 2007, Plaintiff reported that Vicodin and Ibuprofen were working well for her, but that she still had back and neck pain.  She experienced anxiety and nervousness despite taking Xanax twice a day.  She complained of occasional stomach pain and mentioned that she had not been taking Prilosec routinely.  Her depression was "doing well."  Dr. Meidl prescribed Klonopin in place of Xanax and encouraged Plaintiff to take Prilosec daily.  (Tr. 254-56.)  When Plaintiff saw Dr. Meidl on September 13, 2007, she reported that her anxiety was doing "much better" with Klonopin and that her depression was doing "well" with Lexapro.  Dr. Meidl noted high blood pressure and increased Plaintiff's medication for this.  (Tr. 259-59.)

On October 19, 2007, Plaintiff complained to Dr. Meidl of a right-sided headache,

some blurry vision, and increased diffuse muscle pain in her upper extremities, neck, and hands, accompanied by occasional numbness. She had been doing well with respect to depression and so had stopped taking Lexapro, but her anxiety and depression then returned so she restarted Lexapro about one week prior to her visit. She had also run out of Flexeril. Dr. Meidl noted high blood pressure, increased Plaintiff's medication for that, and directed her to restart Flexeril. (Tr. 393-95.)

On October 26, 2007, upon request by Dr. Meidl, Plaintiff was examined by Luvell Glanton, M.D., a pain management specialist. Plaintiff rated her upper and lower back pain as 10 on a scale of 1 to 10, her hand pain as 8, her foot pain as 5, and her knee and groin pain as 7. She stated that her pain was constant and associated with numbness and weakness. She reported that the steroid injections she had received in her shoulder reduced the pain by about 30 percent, but that physical therapy did not help at all. Dr. Glanton diagnosed myofascial pain syndrome in the cervical and lumbar spine, lumbar facet arthopathy, and fibromyalgia. He prescribed Naprosyn for inflammation, discontinued Neurontin, prescribed Lyrica, and recommended that Plaintiff use a TENS unit, get adequate rest and exercise, and pursue massage and other physical therapy. (Tr. 397-403.) At a follow-up visit on November 26, 2007, Dr. Glanton, noting that Plaintiff's myofascial pain had not changed and that her fibromyalgia had worsened, prescribed Zanaflex. (Tr. 426-27.)

On November 30, 2007, Plaintiff saw Dr. Meidl and reported diffuse generalized aches and pains, most prominent in her lower back. Numbness, tingling, and pain in her

fingers made it difficult for her to write or type. She stated that she could only sit or stand for about an hour before pain required her to change position, and that she could not walk for any significant distance. Plaintiff's depression had improved with the addition of Lexapro to the Remeron she was taking. Dr. Meidl noted numerous positive fibromyalgia trigger point tenderness, and continued her current medications for fibromyalgia (Lyrica and Tizanidin). (Tr. 430-33.)

On the same date, Dr. Meidl completed a Medical Source Statement ("MSS") of Plaintiff's ability to do work-related activities. Dr. Meidl indicated in check-box format that Plaintiff could lift less than ten pounds occasionally and no more than five pounds frequently; could stand and/or walk for a total of less than two hours in an eight-hour workday; had to periodically alternate sitting and standing to relieve pain; was limited in pushing and pulling with the upper and lower extremities; could never climb, balance, kneel, crouch, crawl, or stoop; and could frequently, but not constantly, reach, handle, and finger objects. He also wrote that Plaintiff's medications made her light-headed. (Tr. 421-24.)

**Evidentiary Hearing of December 10, 2007** (Tr. 28-75)

Plaintiff, who was represented by counsel, testified that she lived with her husband, who drove her to the hearing, and six-year old son. She reviewed her work history and testified that she had a bachelor's degree in senior services. She testified that she could no longer work after her disability onset date of December 12, 2005, due to depression and hand and back pain. Besides Drs. Meidl and Glanton, Plaintiff was

currently being treated by a counselor, whom she had first seen approximately two weeks prior to the hearing. Plaintiff testified that currently she was taking Naproxen, Neurotonin, Lyrica, Prilosec, Lexapro, Lycinopril, Hydrochlorothiazide, Flexeril, Alprazolam, and Vicodin, and used a TENS unit. Some of the medications made her nauseated and some made her sleepy.

Plaintiff testified that she woke up each morning at 6:30 and helped her son prepare for school. After her son left, Plaintiff would lie down for a half-hour to rest, and then eat breakfast and take her medications. She would then try to "loosen up [her] limbs" by walking around and making the beds, but she did not have a formal exercise routine. She would spend the rest of the day reading, watching television, and figuring out what to make her family for dinner. Plaintiff testified that she could dress herself, but had difficulty washing her hair, something a friend sometimes helped her with. Plaintiff testified that she usually fell asleep on the couch at 6:00 or 7:00 p.m. and went to bed around 11:00. Her sleep was usually interrupted about twice per night due to pain.

Plaintiff testified that when she left the house, it was usually for brief shopping trips. She sometimes rode an electric cart at the store due to pain and swelling in her feet and legs. She attended church approximately once a month, attended her son's parent-teacher conferences, and occasionally went out to eat, but did not participate in any other groups or organizations or go to movies or plays and had not taken any extended trips since she stopped working.

Plaintiff stated that her doctors recommended physical therapy for her hands, but

she could not pursue it because "it hurt really bad" and she had trouble getting to the physical therapist while her husband was at work. She stated that she had anxiety attacks about two or three times a month, each lasting about 20 minutes. She first experienced the attacks before she stopped working, but their frequency had increased in the past three to four months. During an attack, her heart felt like it was going to "jump out of [her] chest" and she started sweating and felt like she was going to pass out. Plaintiff testified that the attacks were triggered by driving in wet weather, or being in a large crowd, and they prevented her from going to crowded places like Wal-Mart.

Plaintiff testified that she had crying spells about once a week and had had suicidal thoughts once or twice, but "tr[ied] to talk to somebody" to alleviate them. She began experiencing depression before she quit work and had been medicated for depression since that time.

Plaintiff testified that she was diagnosed with fibromyalgia about one month ago, though she had symptoms of it since before leaving work. Her symptoms included "tender spots" and "sore spots," primarily on her fingers, legs, and feet. She was exhausted all the time and would "get foggy sometimes . . . trying to remember things." She also experienced lightheadedness, dizziness, and headaches. Her headaches required her to lie down for about 30 minutes, and occurred two to three times a day.

Plaintiff testified that she experienced chronic neck pain stemming from the 1995 car accident and surgery, an injury which was aggravated when she fell at work about three years prior to the hearing. She experienced stiffness and bilateral neck pain that

radiated into her arms and legs about two or three times a day, with each occurrence lasting about an hour. These pains "die[d] off" after she took her medication. She also experienced numbness in her feet, and had lower back pain "every day, constantly." She used the TENS unit for her back pain as suggested by her doctors, but it did not provide relief.

Plaintiff stated that she experienced shortness of breath after climbing the 14 steps in her house. She could walk on flat terrain for about four to five minutes before getting out of breath. She used inhalers and a breathing machine for this problem.

Plaintiff testified that she was five feet, six inches tall and had gained about 25 pounds since her onset date, currently weighing 187 pounds. She stated that if she did not take two or three naps per day she would be exhausted. She could sit comfortably in one place for only about ten minutes, and stand for only five to ten minutes at a time. She testified that she would not be able to complete an eight-hour workday without napping and would be able to sit for only an hour to an hour and a half total. The heaviest object she said she could lift without pain was a cup of coffee or a remote control.

The ALJ asked the VE to consider an individual with Plaintiff's vocational factors (age, education, work experience) who could lift up to ten pounds, stand or walk less than two out of eight hours with the option of alternating between standing and sitting for the rest of the day, climb stairs occasionally, reach, handle, and finger objects frequently but not constantly; but could not do repetitive pushing and pulling with her extremities,

kneeling, crouching, crawling, and stooping.

The VE testified that such an individual could not perform Plaintiff's work in human services as she performed it, which was at the light level, but could perform such a job at the sedentary level, as it was generally performed, or similar sedentary jobs such as cashier or receptionist/information clerk. The VE testified that such a person, however, was not employable if she showed up late for work or took longer than the usual breaks at least once a week at unpredictable times. The VE explained that employers would be unlikely to tolerate such interruptions by entry level employees, but might be more accommodating to a "long-term loyal employee" with "high level skills."

**ALJ's Decision of February 26, 2008** (Tr. 11-25)

The ALJ determined that the Plaintiff was status post-surgical spine fusion and had possible fibromyalgia; carpal tunnel syndrome; mild facet artropathy; possible mild COPD; hypertension; GERD; anxiety; and depression. He found that none of these impairments alone or in combination met the requirements for a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ pointed to Plaintiff's excellent work record but stated that this was only one factor to consider when assessing a disability claimant's credibility.

The ALJ summarized Plaintiff's testimony and determined that Plaintiff had the physical RFC to perform sedentary work,[3] as long as she would be allowed to

_____

[3]    Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files; sitting for about six hours and

periodically alternate between sitting and standing throughout the workday and would not be required to do repetitive reaching, pushing, or pulling with her upper or lower extremities, or any kneeling, crawling, crouching, stooping, or climbing ropes, ladders or scaffolds.

Noting that this RFC was more restrictive (i.e., more favorable to Plaintiff) than that assessed by Mr./Ms. Falter on March 24, 2006, the ALJ pointed to the VE's testimony that a person with this RFC and Plaintiff's vocational factors could perform Plaintiff's most recent job as a human resources director as it was customarily performed in the national economy, as well as some other jobs.

The ALJ acknowledged that if Plaintiff had the functional limitations described by Plaintiff at the hearing or in Dr. Meidl's November 30, 2007 MSS, she would be unable to work, but the ALJ determined that Dr. Meidl's MSS was inconsistent with the preponderance of the medical evidence in the record, including Dr. Meidl's own treatment notes.  Specifically, the ALJ noted that documented episodes of intense incapacitating pain were infrequent, and that neither Dr. Crooks nor Dr. Glanton, both of whom are specialists in treating musculoskeletal pain, suggested that Plaintiff's pain was "unmanageable or disabling."  The ALJ observed that no x-rays, MRIs, or other objective tests demonstrated extensive arthritic or neurological damage to any spinal or joint area, that Plaintiff only had a brief course of physical therapy, and that Plaintiff had not

---

standing for up to about two hours in an eight-hour workday.  20 C.F.R. § 404.1567(a).

undergone recent surgery (other than for some skin lesions) or inpatient hospitalization. Further, the ALJ pointed out that Plaintiff lacked many symptoms typically associated with chronic severe musculoskeletal pain, such as muscle atrophy, persistent muscle spasms, obvious neurological deficits, other signs of nerve root impingement, or bowel or bladder dysfunction.

The ALJ determined that Plaintiff's non-musculoskeletal physical conditions, including her hypertension, GERD, COPD, and lightheadedness, were either well controlled by medication or too infrequent to prevent Plaintiff from maintaining a normal work schedule. Likewise, the ALJ found no evidence of any mood disorder not "well controlled by medication." The ALJ stated that there was no documented evidence of significant adverse side effects from medications that Plaintiff was or had been taking.

The ALJ also found no documented evidence of frequent or uncontrollable panic attacks or signs of severe depression such as frequent crying spells. He stated that at the hearing, Plaintiff displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance. The ALJ then concluded that Plaintiff did not have any credible, medically-established mental or mood disorder that would prevent her from doing ordinary work, including the jobs identified by the VE.

The ALJ determined that Plaintiff's subjective allegations of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity, were not credible. The ALJ stated that her allegations were "inconsistent with the preponderance of the opinions and

observations by qualified medical personnel in this case." The ALJ further found that the statements by Plaintiff's mother, daughter, and friend were "also not proof of disability." He based this determination on the declarants' lack of medical training, their bias towards Plaintiff, and the inconsistency of their reports, like Plaintiff's allegations, with the preponderance of observations by medical personnel.

In sum, the ALJ concluded that Plaintiff was physically and mentally capable of performing past relevant work and, thus, was not disabled.

## New Evidence Presented to Appeals Council and Appeals Council's Decision

On January 11, 2008, Plaintiff saw Dr. Meidl and complained that her depression had worsened, and that she was under "a little more stress lately." Dr. Meidl prescribed Wellbutrin XL to replace Lexapro, due to the side effects from Lexapro. Dr. Meidl noted that Plaintiff was also experiencing a little light-headedness first thing in the morning due to hypertension, but that she was in no acute distress and "[o]therwise [had] no other problems." Plaintiff visited Dr. Meidl again on February 15, 2008, and reported that she had experienced symptoms of upper respiratory illness, including shortness of breath, wheezing, postnasal drip, sinus tenderness, headaches, and low grade fevers, for about two and one-half weeks. Her depression was "doing much better" since beginning Wellbutrin (in addition to Remeron), which she was tolerating well. (Tr. 433-36.) The Appeals Council denied Plaintiff's request for review, and stated that it found that this new information did not provide a basis for changing the ALJ's decision. (Tr. 3-7.)

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Barnhart v. Walton</u>,  535 U.S. 212, 217-22 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  <u>Id.</u> § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulations.  If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work, if any, as she performed it or as it is generally performed in the national economy.  If the claimant can return to past relevant work, the claimant is not disabled.  Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a

significant number of other jobs in the national economy that are consistent with the claimant's vocational factors.

If a claimant can perform the full range of work in a particular category of work (heavy, medium, light, sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a VE as to the availability of jobs that a person with the claimant's profile could perform. <u>Baker v. Barnhart</u>, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

In addition, when, as here, "'the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence.'" <u>Gartman v. Apfel</u>, 220 F.3d 918, 922 (8th Cir. 2000) (quoting <u>Kitts v. Apfel</u>, 204 F.3d 785, 786 (8th Cir. 2000)).

## **Weight Accorded to the Opinion of Plaintiff's Treating Physician**

Plaintiff first argues that the ALJ failed to accord adequate weight to Dr. Meidl's November 30, 2007 MSS. Plaintiff argues that, contrary to the ALJ's decision, the MSS was consistent with Dr. Meidl's treatment notes, specifically of June 7, 2007, when he

wrote that Plaintiff was unable to work, and with the medical record as a whole, including Drs. Glanton's and Crooks's treatment of Plaintiff.

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). A treating physician's opinion that is inconsistent with the physician's own treatment notes need not be credited by an ALJ. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

Here, the Court concludes that the ALJ was entitled not to give Dr. Meidl's November 30, 2007 MSS controlling weight. The ALJ did adopt many of Dr. Meidl's restrictions, such as Plaintiff's need for a periodic sit/stand option, and the limitation in pushing and pulling with her extremities. Dr. Meidl's opinion that Plaintiff could not stand for a total of two hours in an eight-hour work day and could not lift ten pounds even occasionally are the restrictions that the ALJ did not accept. The Court concludes that the ALJ's reasons for not accepting these restrictions are valid. The Court notes that when Plaintiff saw Dr. Meidl in January and February 2008, fibromyalgia, or even musculoskeletal pain, was not mentioned.

The Court also notes that Dr. Meidl's statement on June 7, 2007, that Plaintiff was unable to work is not a medical opinion but rather an opinion on the application of the statute, a task assigned solely to the discretion of the Commissioner.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").  Further, one of the factors Dr. Meidl cited as a contributing factor at that time was Plaintiff's psychiatric problems.  And he specifically noted that she might be able to work part-time in the future.  Indeed, the record reflects that within a short period of time, Plaintiff's depression and anxiety improved with medication.  And when compliant with her medication, these mental conditions remained well-controlled.

**Evaluation of Plaintiff's Fibromyalgia**

Plaintiff argues that the ALJ substituted the views of the medical community and the Eighth Circuit about fibromyalgia with his own feelings that it does not exist as a condition or that it is not a disabling condition.  The Eight Circuit has "long recognized that fibromyalgia has the potential to be disabling," Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004), and that it is "an elusive diagnosis; its cause or causes are unknown, there's no cure, and, of greatest importance to disability law, it's symptoms are entirely subjective."  Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009).  Symptoms of the disease include widespread pain, fatigue, disturbed sleep, and stiffness and tender spots in certain fixed locations of the body.  Stedman's Medical Dictionary, 725 (28th ed. 2006).

Treatments include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories. Brosnahan v. Barnhart, 336 F.3d 671, 672 n. 1 (8th Cir. 2003).

In 1990, the American College of Rheumatology ("ACR") published its Criteria for the Classification of Fibromyalgia. Generally, the ACR proposed the classification of fibromyalgia based upon widespread pain with tenderness at 11 or more of the 18 specific tender point sites. http://www.rheumatology.org/practice/clinical/classification/fibromyalgia/1990. In May 2010, the ACR published its Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, and broadened the important factors (adding cognitive problems and somatic symptoms to the tender point analysis) to consider in clinically diagnosing fibromyalgia. http://www.rheumatology.org/practice/clinical/classification/ fibromyalgia/2010.

Here, as noted above, the ALJ characterized the record as indicating that Plaintiff had "possible" fibromyalgia. In fact, a definite fibromyalgia diagnosis was made on October 26, 2007, by Dr. Glanton. Nevertheless, not every diagnosis of fibromyalgia warrants a finding that the claimant is disabled under the Social Security Act. "As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999) (citation omitted). Here, the Court concludes that the ALJ properly evaluated the record as it relates to fibromyalgia. There is no indication that he did not believe that

fibromyalgia was a recognized condition that could be disabling.

**Evaluation of Plaintiff's Subjective Complaints and Third-Party Statements**

Plaintiff argues that the ALJ erred in discounting Plaintiff's allegations of disabling pain and in discounting the statements of her mother, friend, and daughter. Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility with respect to the severity of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In Polaski v. Heckler, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Id.

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his or her] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). Here, although the ALJ did not go through the relevant factors one by one, this Court's review of the record convinces the Court that substantial evidence exists to support the ALJ's determination that Plaintiff's pain, alone or in combination with her mental health issues, did not preclude her from performing sedentary work that was limited in accordance with the

ALJ's RFC assessment. For example, the record shows that Plaintiff took care of her young son, prepared meals, and did laundry and grocery shopping. Per her mother's third-party statement, Plaintiff handled light household chores and followed oral and written instructions well. The medical records amply demonstrate that Plaintiff's depression and GERD were well-controlled when Plaintiff was compliant with her medication, and she apparently elected not to obtain physical therapy treatment for her carpal tunnel syndrome. Moreover, in February, 2006, Plaintiff advised Dr. Crooks that she had resigned from her job on January 3, 2006, due to increased stress and low energy -- not debilitating pain. She further stated that she had returned to school, majoring in education, and that she "helped out" at a thrift shop that she owned. And as discussed above, the post-hearing records of Dr. Meidl noted complaints of light-headedness and of depression, which again improved quickly, but make no mention of fibromyalgia or other pain, rather noting that Plaintiff was in no acute distress and otherwise had no other problems. Thus, the ALJ's failure explicitly to apply each relevant Polaski factor to the evidence is not reversible error. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) ("[A]lthough specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record.") (citing Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996)). Because the same evidence also supported discounting the testimony of the other third-parties in this case, any weakness in the ALJ's reasons for disregarding their statements is inconsequential. See id.

**Reliance on the VE's Testimony**

Plaintiff argues that the ALJ erred by relying on the VE's testimony that a person with Plaintiff's vocational factors and RFC could perform Plaintiff's past job, because this testimony was based on the ALJ's RFC assessment that, as set forth above, Plaintiff argues was flawed. Indeed, in order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); testimony by a VE "based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (citation omitted). The question, however, need not include alleged limitations which the ALJ properly discredits. Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004). The Court's conclusions that the ALJ did not commit reversible error in not accepting the extent of Plaintiff's physical limitations due to pain as asserted by Plaintiff, the third-parties, and Dr. Meidl's MSS undermines Plaintiff's argument with regard to the hypothetical question posed to the VE.

**ALJ's Alleged Bias**

Plaintiff's last claim is that the ALJ in this case has "a known and proven general bias" against Social Security disability claimants with similar characteristics to those

Plaintiff alleges.[4]   In support of this claim, Plaintiff has submitted statistics based on this ALJ's decisions in the 54 previous cases in which the law firm representing Plaintiff represented the claimant.  These statistics show that of the 54 cases, 32 resulted in denials, for a denial rate of 59.2 percent,[5] as compared to a national denial rate of 39 percent.  Of the 54 cases, 22 involved obese claimants, 19 of whose claims were denied, resulting in a denial rate for obese claimants of 86.3 percent.  Of the 19 denied, 17 were female.  Plaintiff's statistics further show that 41 of the 54 claimants alleged a mental impairment; in 34 of the 41 cases the claimant was found not to have a mental impairment, for a denial rate of 82.9 percent.  Of the 54 cases, 8 alleged fibromyalgia; all were obese females and all were denied.  Plaintiff has also submitted the approval/denial rates of all Social Security ALJs in St. Louis for the year 2006.  These rates show that the ALJ in this case had the lowest approval rate of 36 percent, as compared to the other ALJs' approval rates ranging from 48 percent to 85 percent.

In an administrative hearing, as in a judicial proceeding, a party has a due process right to be heard by an impartial decision maker.  Keith v. Massanari, 17 F. App'x 478, 481 (7th Cir. 2001).  ALJs are presumed to be unbiased, although this presumption can be

_____

[4]    Plaintiff argues that, therefore, if the case is remanded, it should be remanded to a different ALJ.  But the claim of bias, if established, would itself  require reversal and remand, and so the Court will address this claim even though Plaintiff is not entitled to a remand based on her other arguments.

[5]    This rate includes four partial favorable decisions as favorable decisions; without these decisions, the denial rate would be 66.3 percent.

rebutted by showing a conflict of interest or some other specific reason for disqualification. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857-58 (9th Cir. 2001). The type of evidence relied upon by district courts to grant relief where bias of a particular ALJ against Social Security claimants is asserted include (1) admissions by the ALJ indicating generalized bias or predisposition against Social Security claimants generally or certain groups specifically; (2) testimony from attorneys regarding the ALJ's regular use of incorrect law; (3) statistical evidence showing the number of cases involving problematic credibility determinations; and (4) statistical evidence showing the number of times claimants received benefits after remand or on subsequent applications. <u>Martin v. Astrue</u>, No. 2:09CV00033 JCH/DDN (E.D. Mo. May 4, 2010) (citing <u>Doan v. Astrue</u>, No. 04CV2039 DMS (RBB), 2010 WL 1031591, at *14 (S.D. Cal. Mar. 19, 2010)).

In this case, the ALJ afforded Plaintiff a hearing that lasted for over an hour. None of his comments or questions during the hearing show bias or disrespect to Plaintiff or her claims[6]; nor does anything in the ALJ's written opinion display such a bias. Plaintiff has not cited this Court to any cases where an adverse decision has been overturned on the basis of the kind of statistics presented here. In three recent cases, this Court has rejected similar claims brought by Plaintiff's counsel involving this ALJ: <u>Bowen v. Astrue</u>, 2:09 CV 39 DDN, 2010 WL 2653458 at *17 (E.D. Mo. June 29, 2010);

---

[6] The Court rejects Plaintiff's assertion in her brief (Doc. #14 at 22) that the ALJ's reference to Lifetime TV as "the girl channel" shows a bias against women claimants.

Waters v. Astrue, 2:09 CV 28 DDN, 2010 WL 2522702, at *14 (E.D. Mo. June 16, 2010); and Martin, No. 2:09CV00033 (involving an obese male claimant).  Other courts take the same approach.  See Johnson v. Comm'r of Soc. Sec., No. 08-4901 WJM, 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009) ("[A]n ALJ's impartiality should not be judged by result or reputation or by statistics of how that judge has previously ruled."); Smith v. Astrue, 2008 WL 4200694, at *5 (S.D. Tex. Sept. 9, 2008) ("[D]istrict courts are in no position to judge what threshold percentage of 'favorable' decisions is necessary to acquit an ALJ of suspicion of intolerable bias against Social Security claimants.").

Plaintiff has not provided any evidence that the ALJ has made any derogatory statements about Social Security claimants, or that he made any statements about conserving government money.  See Doan, 2010 WL 1031591, at *14 (referring to ALJ's statements about "no-goodnicks" and a need "to protect the public treasury ").  She does not point to any regular use of incorrect legal standards by the ALJ.  And significantly, she does not provide any statistics showing how many of the ALJ's decisions have been reversed and/or remanded by the Appeals Council or a court, or how many times claimants have subsequently received benefits.  The Court concludes that although the statistics presented here may be viewed as somewhat troubling, they do not rise to the level of establishing bias.

## CONCLUSION

The Commissioner's decision is supported by substantial evidence on the record as a whole, and Plaintiff has not established bias by the ALJ.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2010.